## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BROOKE L. MOSHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 23-cv-2384-RJD** |
| | ) | |
| **JENNIFER CLAYTON,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:[1]**

Plaintiff Brooke L. Mosher filed the instant lawsuit pro se under 42 U.S.C. § 1983, seeking monetary relief against Defendants Jennifer Clayton and Jacquelyn Austin, in their individual capacities as social workers for the Illinois Department of Children and Family Services ("DCFS") for removing Plaintiff's son, C.J. from his home and parents and eventually placing him under DCFS's protective custody. Following the threshold review of the Complaint under 28 U.S.C. § 1915(e)(2)(B), Plaintiff was allowed to proceed on the following claims:

Claim 1:    Fourth Amendment claim of unlawful seizure against Defendants Austin and Clayton, in their individual capacities, for removing Plaintiff's minor son from his home and parents and taking him into someone else's custody;

Claim 2:    Fourth Amendment claim against Defendants Austin and Clayton, in their individual capacities, for continuing withholding of Plaintiff's son C.J. after Plaintiff had a completely negative drug test in October 2022;

Claim 3:    Fourteenth Amendment procedural due process claim against Defendants Austin and Clayton, in their individual capacities, for repeatedly failing to listen to Plaintiff's admonitions regarding her son, falsely reporting that Plaintiff was no longer interested in adhering to the Safety Plan and for allowing the hearing regarding C.J.'s custody to go forward while Plaintiff was in custody.

---

[1] This matter has been assigned to the undersigned through the parties' consent. (Doc. 33).

(Doc. 14).

This matter comes before the Court on Plaintiff's Emergency Motion to Stay Adoption Proceedings (Doc. 96) and Defendants' Motion for Summary Judgment (Doc. 121). As explained below, Plaintiff's motion is **DENIED,** and Defendants' motion is **GRANTED**.

**I.      Plaintiff's Emergency Motion to Stay Adoption Proceedings (Doc. 96)**

Plaintiff filed an emergency motion asking this Court to stay C.J.'s adoption proceedings that are pending in state court. (Doc. 96). Plaintiff concedes that her parental rights were terminated in October 2024, in an ex parte state court hearing. (*Id.*). Defendants opposed the motion. (Doc. 111). Plaintiff was allowed to proceed in this case only on her constitutional claims seeking monetary damages against Defendants in their individual capacities. She has not sought injunctive relief. (Doc. 14, p. 1). "An injunction, like any 'enforcement action,' may be entered only against a litigant, that is, a party that has been served and is under the jurisdiction of the district court." *Maddox v. Wexford Health Sources, Inc.*, 528 F.App'x 669, 672 (7th Cir. 2013) (internal citation omitted). Plaintiff's motion requests that this Court stay all adoption proceedings related to the October 2024 termination of her parental rights. However, Defendants are not parties to the adoption proceedings, and DCFS, which is a party to the adoption proceedings, is not a party to this dispute. Because Defendants cannot carry out the injunctive relief Plaintiff requests, the motion is **DENIED**. The Court further notes that the domestic relations exception to federal jurisdiction would bar the court from adjudicating a claim for injunctive relief regarding the termination of Plaintiff's parental rights and C.J.'s adoption proceeding. *Newman v. State of Ind.*, 129 F.3d 937, 939 (7th Cir. 1997) ("The subject of domestic relations, including adoptions, is the primary responsibility of the state courts, administering state law, rather than of the federal courts").

**II.    Defendants' Motion for Summary Judgment (Doc. 121)**

Defendants filed a Motion for Summary Judgment (Doc. 121). Plaintiff responded (Doc. 135), and Defendants replied (Doc. 141). Defendants included a Statement of Material Facts in their Motion for Summary Judgment, with proper citation to the record, which Plaintiff failed to deny. (Doc. 122, pp. 2-7; Doc. 135). Accordingly, Defendants' factual allegations are being deemed admitted. *See* SDIL-LR 56.1 (b) & (g).

### Factual Background

On June 27, 2022, the DCFS child abuse and neglect hotline received a report regarding four-year-old C.J., Plaintiff's biological child. (Doc. 122, ¶ 1). The report alleged that Plaintiff, her husband Wesley Mosher, and C.J. were transient and living in various hotels and that Plaintiff and Wesley gave C.J. Xanax and cannabis to calm him down, sedate him, and get him to sleep. (*Id.*). The report also stated that Plaintiff and Wesley were previously indicated for inadequate supervision in May 2022 for leaving C.J. in a car while they went gambling, and that Plaintiff refused services in that investigation. (*Id.*). Defendant Austin was the DCFS Child Protection Investigator assigned to investigate the allegations of abuse and neglect against Plaintiff. (Doc. 122, ¶ 2). Defendant Clayton was a DCFS child abuse and neglect supervisor who supervised Defendant Austin's investigation against Plaintiff. (Doc. 122, ¶ 3).

The Child Protection Investigation

As part of the initial investigative process, on June 28, 2022, Defendant Austin went to the address given as Plaintiff's residence, which was actually the home of Debra Mosher, Wesley's step-mother. (Doc. 122, ¶ 4). Defendant Austin interviewed Debra, who advised that Plaintiff, Wesley, and C.J. never lived at her address but used it because they were transient. (*Id.*). Debra stated that she had concerns for the Plaintiff and C.J. relating to the family and Plaintiff's and

Wesley's alleged drug use. (*Id.*). On June 28, 2022, Defendant Austin also had a phone interview with Jerald Mosher, Wesley's father. Jerald advised he had concerns for C.J.'s stability and nutrition, and that he suspected, but had not witnessed, Wesley use drugs. (*Id.*).

On July 1, 2022, Defendant Austin visited Debra's house after Debra notified her that Wesley, Brooke, and C.J. were there. (Doc. 122, ¶¶ 6-7). Plaintiff advised Defendant Austin that her family was transient and had been living in different hotels for the past year. (Doc. 122, ¶ 8). Plaintiff denied giving C.J. cannabis or Xanax and denied any drug use, but an oral toxicology screen conducted that day was presumptively positive for methamphetamine. (*Id.*). Plaintiff told Austin that she had been diagnosed with bipolar disorder, depression, and anxiety, and she used to take Seroquel and Zoloft but had not taken medication for eight years. (*Id.*). Plaintiff advised that she had a doctor's appointment the following week for an evaluation, but she was unable to provide the name of the facility where the appointment was scheduled. (*Id.*). That same day, Defendant Austin spoke to C.J., who stated he lived with his mother and father and felt safe with them. (Doc. 122, ¶ 9). C.J. also stated that his parents had given him some medicine to sleep, but he could not provide additional information. (*Id.*). Austin also interviewed Wesley, who advised he recently returned from Colorado, where he was on probation for two criminal offenses. (Doc. 122, ¶ 10). Wesley denied using drugs, but his oral toxicology screen also returned presumptively positive for methamphetamine. (*Id.*).

During the interviews on July 1, 2022, Plaintiff agreed to a safety plan that provided for C.J. to stay with Terry and Dena Jones-Smith, Wesley's mother and her wife, and for Plaintiff to have supervised contact with C.J. (the "Safety Plan"). (*Id.*). Plaintiff's agreement to the Safety Plan acknowledged that it was voluntary. (Doc. 122, ¶¶ 12-14). The Safety Plan provided that for

its termination, Brooke and Wesley had to complete drug tests with negative results for illicit drugs or drugs not prescribed to them. (Doc. 122-2, ¶¶ 9-10).

On July 5, 2022, Plaintiff and Wesley took urine-based drug tests at the request of DCFS. (Doc. 122, ¶ 16). Both Plaintiff and Wesley refused to take a hair follicle test. (*Id.*). The testing facility reported that Plaintiff had difficulty following its test-taking procedures, and the facility was concerned that Plaintiff took a urine sample into the bathroom, undermining the accuracy of the results. (Doc. 122, ¶¶ 16-17).

On July 7, 2022, Plaintiff verbally consented to the continuation of the Safety Plan and signed a new safety plan on July 8, 2022 (the "Renewed Safety Plan". (Doc. 122, ¶ 15). The Renewed Safety Plan continued Plaintiff's agreement to have C.J. remain in the home of Terry and Dena and for Plaintiff to have supervised contact with C.J. (*Id.*).

During the investigation, Defendants Austin and Clayton learned that DCFS had previously indicated Plaintiff and Wesley for inadequate supervision after leaving C.J. in a car to gamble. (Doc. 122, ¶18). As a result of that incident, Plaintiff and Wesley were also charged with child endangerment. Plaintiff had a substantiated report with Colorado Child Services. (*Id.*). On July 14, 2022, Plaintiff advised Defendant Austin that she no longer agreed to the Safety Plan, at which time Defendant Clayton decided to take protective custody of C.J. (Doc. 122, ¶¶ 19-20).

Juvenile Court Proceedings

On July 15, 2022, the Madison County State's Attorney filed a Juvenile Petition, Case No. 22-JA-145, in the Third Municipal Circuit in Madison County, Illinois alleging that C.J. was a neglected minor whose environment was injurious due, in part, to Plaintiff's untreated mental health needs, Plaintiff's substance abuse issues that impaired her ability to adequately care for him and the lack of stable housing. (Doc. 122, ¶ 21). On July 18, 2022, the Court found there was probable cause supporting the juvenile petition, that there was an "immediate and urgent necessity

to remove C.J. from his home," and that leaving C.J. in the home environment would be contrary to his health, safety, and welfare. (Doc. 122, ¶ 22; Doc. 135, pp. 18-21). The state court granted temporary custody of C.J. to DCFS with the right to place C.J. (*Id.*).

Defendant Austin's last contact with Plaintiff or C.J. was July 19, 2022. (Doc. 122, ¶ 22). At a renewed temporary custody hearing on July 28, 2022, Plaintiff did not appear because she was in custody. (Doc. 122, ¶ 25). The court again found probable cause for the petition and awarded temporary custody to the DCFS Guardianship Administrator, with the power to place C.J. (*Id.*). On August 3, 2022, Defendant Austin's last involvement with this investigation was a transitional visit with the private agency responsible for providing case management services to Plaintiff and C.J. (Doc. 122, ¶ 26). On August 4, 2022, after the completion of the DCFS child abuse and neglect investigation, DCFS informed Plaintiff she was indicated for child neglect. (Doc. 122, ¶ 27). In October 2022, Plaintiff's drug test was negative. (Doc. 135, p. 2). On December 14, 2022, the Madison County State's Attorneys' Office filed an Amended Juvenile Petition, alleging that C.J. was a neglected minor whose environment was injurious for the reasons set forth in the original petition and amending the petition to add Plaintiff's criminal convictions for retail theft and child endangerment. (Doc. 122, ¶ 28). On December 19, 2022, the Court entered an order finding Plaintiff unfit to care for, protect, train, educate, supervise, or discipline C.J; C.J. was adjudicated neglected and made a ward of the Court, with DCFS maintaining custody. (Doc. 122, ¶ 29). On October 15, 2024, the state court entered an order terminating the Plaintiff's parental rights, which the Appellate Court of the Fifth District affirmed on January 15, 2025. (Doc. 122, ¶¶ 34-35). On March 28, 2025, Plaintiff filed a petition for leave to appeal to the Supreme Court of Illinois, which was denied. (Doc. 122, ¶ 37).

**Discussion**

*Legal Standard*

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). However, the Court is not required to consider materials that do not contain a proper citation to the record. Fed. R. Civ. P. 56(c)(3); *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003) (noting that district courts "are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them"). The parties must support their factual allegations by citing to admissible parts of the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A)

& (c)(2). Affidavits or declarations that are "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4). A party's failure "to properly support an assertion of fact or . . . to properly address another party's assertion of fact" can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Defendants argue they are entitled to summary judgment because the Court lacks jurisdiction under the *Rooker-Feldman* doctrine or, alternatively, the claims are barred by res judicata. They also challenge Plaintiff's claims on their merits and raise the affirmative defense of absolute and qualified immunity. The Court will address each argument in turn.

### a.  The *Rooker-Feldman* Doctrine

Because Defendants raise the *Rooker-Feldman* doctrine, which is a "jurisdictional bar," the Court must first consider whether it has subject-matter jurisdiction over Plaintiff's claims. *Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 764–66 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1167, 221 L. Ed. 2d 250 (2025) (citation omitted). The *Rooker-Feldman* doctrine recognizes that district courts lack jurisdiction to conduct appellate review of state court judgments, because Congress exclusively "vested" such authority at the federal level in the Supreme Court. *Id.* (citing 28 U.S.C. § 1257(a); *Sykes v. Cook County Circuit Court Probate Div.*, 837 F.3d 736, 741 (7th Cir. 2016)). The doctrine is named after *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the only cases in which the Supreme Court found the doctrine applicable. *Gilbank*, 111 F.4th at 764–66. Its application, however, is "guided by the Supreme Court's authoritative restatement of the doctrine in *Exxon Mobil Corp. v. Saudi Basic Industries*

*Corp.*, 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)." *Gilbank*, 111 F.4th at 764–66. There, the Supreme Court narrowed the scope of the doctrine to bar federal jurisdiction only in the "limited circumstances" when the following four elements are satisfied: (a) the federal plaintiff is a state-court loser, (b) the state-court judgment became final before the federal proceedings began, (c) the state-court judgment caused the alleged injury underlying the federal claim, and (d) the federal claim invites the district court "to review and reject" the state-court judgment. *Id.* The doctrine should be "applied on a claim-by-claim basis." *Id.* (citing *Feldman*, 460 U.S. at 486–87; *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 646–47 (7th Cir. 2011)).

Because the Court finds that the fourth element of the *Rooker-Feldman* doctrine is not satisfied in this case, discussion of the remaining elements is not necessary.[2] The Seventh Circuit has clarified that the "review and rejection" requirement of the *Rooker-Feldman* doctrine requires the district court to compare the relief that the plaintiff seeks in the federal action with the relief granted by the state judgment.[3] *Gilbank*, 111 F.4th at 792 (Kirsch, J.). The *Rooker-Feldman* doctrine will bar the Court's jurisdiction only when the plaintiff seeks to "overturn" or "undo" the state court judgment. *Id.* It is rare, "though not impossible," that the "review and rejection" prong will be satisfied where the plaintiff's federal action only seeks monetary damages but challenges a state court judgment that did not sound in monetary terms. *Id.*

For instance, the *Rooker-Feldman* doctrine did not apply to suits seeking monetary damages for fraud in state custody proceedings when the plaintiff did not seek to set aside the state judgment. *Gilbank*, 111 F.4th at 793 (Kirsch, J.) (citing *Brokaw v. Weaver*, 305 F.3d 660, 663 (7th

---

[2] Defendants' motion not only does not analyze each separate element of the doctrine but also lumps together all three claims Plaintiff raises in this action, thus failing to engage in the nuanced analysis required under the Supreme Court's and Seventh Circuit's jurisprudence.

[3] Judge Kirsch's concurrent opinion in *Gilbank* on the "review and rejection" element of the *Rooker-Feldman* doctrine was joined by five judges, rendering it the majority opinion of the en banc court on that issue. *See Gilbank,* 111 F.4th at 760.

Cir. 2002); *Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769, 773 (7th Cir. 2014)). More recently, in *Gilbank*, the Seventh Circuit held that the *Rooker-Feldman* doctrine did not bar federal jurisdiction over a mother's civil rights claims for damages for an injury inflicted by a state court's temporary award of her minor daughter's custody to her father. *Id.* at 798 (Kirsch, J.). The court explained that the mother's request for monetary relief in the federal action did not invite the federal court to "review and reject" the state court judgment because, *inter alia*, an award of monetary damages would "not undo the custody determination." *Id.*

Here, Plaintiff was allowed to proceed in this case only on her request for monetary relief against Defendants in their individual capacities. (Doc. 14, pp. 1). The Court has denied Plaintiff's attempts to seek injunctive and declaratory relief that would interfere with the state court proceedings.[4] (Doc. 80, pp. 2-6). Defendants argue that the *Rooker-Feldman* doctrine bars jurisdiction because "Plaintiff asks the Court to address claims for which the requested relief would necessarily require a finding that the state court had wrongly decided the issue." (Doc. 122, p. 11). Not quite. Defendants point to the state court orders placing C.J. into DCFS custody, granting temporary custody of C.J. to DCFS, changing the permanency goal, and ultimately terminating Plaintiff's parental rights. None of these state court judgments sounded in monetary terms. Comparing the requested relief in this case with the relief awarded in the state court judgments, as the Seventh Circuit directs in *Gilbank*, the Court cannot find that awarding monetary damages for the alleged constitutional violations would "overturn" or "undo" those state court judgments that sound in equity. *Gilbank*, 111 F.4th at 798 ("awarding Gilbank damages could do nothing to the custody judgment because . . . the judgment provided equitable relief that an award of damages would not undo"). Accordingly, the *Rooker-Feldman* doctrine does not bar this Court's jurisdiction

---

[4] Plaintiff had attempted to raise claims for injunctive relief in other cases in this district (23-CV-1808 and 23-CV-463), which were dismissed without prejudice at preliminary review of the Complaint under § 1915(e)(2)(B).

over Plaintiff's civil right claims for monetary relief.

### b. Res Judicata

Defendants also raise the affirmative defense of res judicata (claim preclusion), arguing that the Court cannot "relitigate decisions made by the circuit court or the court of appeals." (Doc. 122, pp. 11-12). While Defendants reference res judicata, they also cite case law regarding collateral estoppel (issue preclusion). Yet, they fail to analyze the elements of either doctrine.[5] Because Defendants have not adequately developed this argument in their brief, the Court will not address the affirmative defense of claim preclusion. Issue preclusion, however, is discussed in the Court's analysis of the merits of Plaintiff's claims to the extent applicable thereto.

### c. Plaintiff's Fourth Amendment and Substantive Due Process Rights

Plaintiff alleges that Defendants' initial removal of C.J. from her custody and his continued withholding after Plaintiff received a negative drug test in October 2022 were unlawful. In the preliminary review of the Complaint under § 1915(e)(2)(B), Judge Yandle found that Plaintiff's allegations in the Complaint raised a Fourth Amendment Claim for unlawful seizure. (Doc. 14, pp. 7-8). Relying on the well-established principle that substantive due process "should not be called upon when a specific constitutional provision protects the right allegedly infringed upon," and having found that Plaintiff had sufficiently alleged a Fourth Amendment Claim for C.J.'s unlawful seizure, Judge Yandle concluded that the Complaint did not "state a definite substantive due

---

[5] In Illinois, the res judicata doctrine applies when there is "(1) a final judgment on the merits rendered by a court of competent jurisdiction, (2) the same cause of action, and (3) the same parties or their privies." *Bonnstetter v. City of Chicago*, 811 F.3d 969, 975 (7th Cir. 2016) (internal quotation omitted). If those requirements are satisfied, "[t]he bar to subsequent litigation 'extends to what was actually decided in the first action, as well as those matters that could have been decided in that suit.'" *Baek v. Clausen*, 886 F.3d 652, 660 (7th Cir. 2018) (quoting *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302, 703 N.E.2d 883, 889 (1998)). Issue preclusion, on the other hand, under Illinois law requires that: (1) the issues decided in the prior adjudication are identical to issues presented for adjudication in the current proceeding; (2) there be a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action." *Kalush v. Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir.1999). *Weaver*, 305 F.3d at 669, *disapproved on different grounds by Gilbank*, 111 F.4th 754.

process claim." (*Id.* (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1017-18 (7th Cir. 2000)).

Defendants argue they are entitled to summary judgment on Plaintiff's Fourth Amendment claim for C.J.'s initial seizure and the continuation of his withholding because Plaintiff is not proceeding in this case as C.J.'s next friend, and C.J. was the only individual seized. The Court agrees. While C.J. could bring a constitutional claim under the Fourth Amendment for his initial seizure and the continued withholding, Plaintiff, who was not the individual seized, can only prevail under substantive due process for interference with a familial relationship. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011) (explaining that in this context, the seized child has a Fourth Amendment claim, while his or her parents have a substantive due process claim for interference with familial relationship); *Doe v. Heck,* 327 F.3d 492, 518 n.23 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) (holding that a child's constitutional claim grounded on his seizure is properly analyzed under the Fourth Amendment rather than substantive due process unless it is alleged that the seizure "coincided with other conduct amounting to an interference with the parent-child relationship"). The Court, however, must further examine whether Plaintiff can prevail in her substantive due process claim.[6]

The Seventh Circuit has long recognized that substantive due process of the Fourteenth Amendment encompasses the "right to familial integrity in the context of action by child protective services." *Gilbank*, 111 F.4th at 788 (quoting *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017)). That right, however, is not unlimited and "must be weighed against the state's interest in protecting children from harm." *Id.* Caseworkers may lawfully take a child into protective custody or otherwise interfere with familial integrity when there is "some definite and articulable evidence

---

[6] The preliminary review of the Complaint concluded that Plaintiff did not "state a definite substantive due process claim," only because it had found that Plaintiff had asserted a Fourth Amendment claim on the same grounds. (Doc. 14, pp. 7-8). Because, based on the developed record, Plaintiff cannot prevail on a Fourth Amendment claim for C.J.'s unlawful seizure, analysis of her claims under substantive due process is necessary.

giving rise to a reasonable suspicion of past or imminent danger of abuse." *Id.* (internal quotation marks omitted) (quoting *Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012)). "Reasonable suspicion" requires that the state actors have "more than a hunch but less than probable cause." *Id.*

### i.   C.J.'s Initial Removal from his Parents and Placing into Someone Else's Custody

Defendants argue they are entitled to summary judgment on Plaintiff's substantive due process claim for C.J.'s initial seizure because the state court granted temporary custody of C.J. to DCFS, finding that there was "an immediate and urgent necessity to remove C.J. from his home." (Doc. 122, pp. 5-6, Statement of Material Facts ¶¶ 22, 25, 29, 32; Doc. 113-4, pp. 100-122; Doc. 123-1, pp. 200-204; Doc. 124, pp. 124-127; 129-133). In the Complaint, Plaintiff had alleged that C.J.'s seizure was unlawful because "there was no indicia of abuse or potential immediate threat of abuse, given that the call to DCFS was made for extortion purposes, and that C.J. was healthy and happy at the time of his removal." (Doc. 14, p. 6). In her response to the motion, Plaintiff further challenged the Safety Plan pursuant to which C.J. was initially taken away from his parents for being coercive and involuntary.

C.J.'s Removal on July 1, 2022, pursuant to the Safety Plan

Instead of immediately removing a child from his parents, the state may offer them the option of a "safety plan." *Hernandez*, 657 F.3d at 481. The safety plan may require that a child be placed with other family members while an investigation into suspected abuse is pending. *Id.* (citing *Dupuy v. Samuels,* 465 F.3d 757, 760 (7th Cir. 2006)). While safety plan restrictions are typically "less extreme than removing the child from parental custody altogether, ... they may be invasive enough to count as deprivations of liberty . . . ." *Id.* Because safety plans are the product of consent, the Seventh Circuit has held that parents do not have a right to a hearing before being offered that option. *Id.* (citing *Dupuy,* 465 F.3d at 761-62) ("hearings are required for deprivations

ordered over objection, not for steps authorized by consent."). However, a child's seizure pursuant to a safety plan will violate substantive due process when the parent's consent is obtained through duress or other illegal means. *Id.* A safety plan will be a product of duress, for instance, when the parents' consent was obtained by "[e]xerting pressure to obtain a result to which the party applying the pressure had no right." *Id.* (quotation marks omitted) (citing *Dupuy,* 465 F.3d at 763). Thus, in *Hernandez*, the court concluded that a social worker was not entitled to summary judgment for a child's initial seizure based on the execution of a safety plan, where at the time the safety plan was presented, the social worker had no reasonable suspicion that the child had been abused or was in imminent danger of abuse. *Id.* at 482; *see also Dupuy,* 465 F.3d at 763 (social workers' threat to take action that they had no legal authority to take was improper and violated familial rights).

Here, the record supports a finding that Defendant Austin had reasonable suspicion that C.J. was abused or was in imminent danger of abuse when she offered the Safety Plan on July 1, 2022.[7] Defendant Austin interviewed Plaintiff and Wesley on that day after having received a report that they had given C.J. Xanax and cannabis to calm him down, sedate him, and get him to sleep. (Doc. 122, ¶¶ 1, 7-8, 10). The report further stated that Plaintiff and Wesley were previously indicated for inadequate supervision in May 2022 for leaving C.J. in a car when they went to gamble, and that Plaintiff refused services as part of that investigation. (Doc. 122, ¶ 1). C.J.

---

[7] The state court's finding that there was "an immediate and urgent necessity to remove C.J. from his home" at the shelter care hearing on July 18, 2022, does not preclude this Court from determining whether Defendant Austin had a reasonable suspicion that C.J. was abused or was in imminent danger of abuse on July 1, 2022, when she offered the Safety Plan. Issue preclusion does not apply unless the issues are identical. *See Weaver*, 305 F.3d at 670. Here, the state court addressed the necessity of C.J.'s removal more than two weeks after Defendant Austin offered Plaintiff the Safety Plan, and after Plaintiff had lost interest in adhering to it. Further, Plaintiff argues that Defendant Austin disregarded Plaintiff's claims that the hotline report was made for the purpose of extortion and that Austin further made false statements to the state court regarding Plaintiff's intention to adhere to the Safety Plan. These are challenges to the "integrity of the record" that establish reasonable suspicion rather than its sufficiency, and there is no indication that the state court considered that issue. *See Weaver,* 305 F.3d at 669–70 (noting that while challenges concerning "the sufficiency of the evidence to establish probable cause" were barred by collateral estoppel, challenges as to their "integrity" were not).

confirmed that day that his parents had given him some medicine to help him sleep, but he was unable to provide any further information. (Doc. 122, ¶ 9). Despite Plaintiff and Wesley denying use of methamphetamines or other illicit drugs, their oral toxicology screen returned presumptive positive for methamphetamine. (Doc. 122, ¶¶ 8-9). Plaintiff also told Defendant Austin that her family had been transient for the past year and that Plaintiff had untreated mental health issues. Austin corroborated the report by conducting interviews with Wesley's parents, who expressed concerns about Plaintiff and Wesley's drug use and about C.J. being malnourished. Based on the totality of the circumstances, there was "definite and articulable evidence" giving rise to a reasonable suspicion that C.J. was abused or in imminent danger of abuse on July 1, 2022, when Defendant Austin offered the Safety Plan. *See Gilbank*, 111 F.4th at 788-89 (finding reasonable suspicion of past or imminent danger of abuse where police officer and social worker performed welfare check at mother's apartment based on report of anonymous caller that mother and child appeared to be living in garage during hot summer weather, mother acknowledged pending charge for methamphetamine possession and history of drug abuse when they asked her to provide urine sample, and she had just been arrested for possession of methamphetamine when they encountered her later).

Plaintiff's allegations that "there was no indicia of abuse or potential immediate threat of abuse, given that the call to DCFS was made for extortion purposes, and that C.J. was healthy and happy at the time of his removal" are unsubstantiated. (Doc. 14, p. 6). Plaintiff has not cited any admissible corroborating evidence, such as discovery responses, declaration, or affidavit. (Doc. 135, pp. 2; 63-64). Plaintiff cites "Exhibit 8" in support of her allegation that the investigator failed to disclose that the anonymous tip was made for extortion purposes, but that exhibit only contains negative drug test results from October 2022. (*Id.*). Even if the anonymous report was made for

extortion purposes, the remaining evidence, including C.J.'s confirmation that he had received medication for sleeping, the prior investigation for inadequate supervision, the presumptive positive tests for methamphetamine, and the testimonies of Wesley's father and stepmother regarding concerns for C.J.'s malnutrition sufficed to support Defendant Austin's reasonable suspicion of past or imminent danger of abuse.

Also unsubstantiated are Plaintiff's conclusory allegations that the Safety Plan was coercive because Defendant Austin made false statements and forced her to sign it. (Doc. 135, pp. 2-3; 32-34). Plaintiff's agreement to the Safety Plan acknowledged that it was voluntary and provided that C.J. would stay with Wesley's mother. (Doc. 122, ¶12). Plaintiff points to certain excerpts of DCFS's investigative record regarding the execution of the Safety Plan, which, however, do not in any way support her allegations. (Doc. 135, pp. 2-3; 32-34). While Plaintiff includes handwritten notes on those excerpts suggesting that Defendant Austin made false statements and forced Plaintiff to sign the Safety Plan, those notes are not part of the admissible record and therefore do not create a genuine dispute on the legality of the Safety Plan.[8] Plaintiff's alternative argument that C.J.'s removal on July 1, 2022, was unlawful due to the lack of a warrant also lacks merit. The record shows that C.J. was removed pursuant to the lawfully obtained Safety Plan. No warrant was required under those circumstances. *Hernandez*, 657 F.3d at 481 (holding that seizure of a child pursuant to a safety plan violates substantive due process only when the parent's consent is obtained through duress or other illegal means).

Because there is no genuine dispute that Defendants had a reasonable suspicion that C.J.

---

[8] Plaintiff also asserts that Defendants continued to impose a "coercive safety plan despite Plaintiff's compliance." (Doc. 135, ¶ 9). Plaintiff, however, cites the Visitation and Contact Plan dated August 15, 2022, after the state court had already awarded temporary custody to DCFS. (Doc. 135, pp. 2, 37-42). Accordingly, that argument is not relevant to the analysis of the legality of C.J.'s initial removal pursuant to the Safety Plan. (Doc. 135, ¶ 9). Likewise, irrelevant to the legality of the Safety Plan is Plaintiff's negative drug test in October 2022. (Doc. 135, ¶ 10).

had been abused or was in imminent danger of abuse at the time the Safety Plan was offered, the

Safety Plan was not coercive, and Defendants are entitled to summary judgment on that ground.

<u>DCFS's Taking of C.J. under Protective Custody on July 14, 2022, and the State Court's
Award of Temporary Custody to DCFS on July 18, 2022</u>

To the extent Plaintiff's substantive due process claim for C.J.'s "initial removal" targets

the DCFS's taking of C.J. under protective custody on July 14, 2022, and the state court's decision

on July 18, 2022, to award temporary custody of C.J. to DCFS, Defendants are still entitled to

summary judgment. First, collateral estoppel bars this Court from reviewing the sufficiency of the

record on which the state court relied to find probable cause on July 18, 2022. Generally, collateral

estoppel prohibits the re-litigation of any settled issue that was necessary to a prior final judgment.

The Full Faith and Credit Statute mandates that this Court give judgments of Illinois courts the

preclusive effect they would have in Illinois's state judicial system. 28 U.S.C. § 1738; *Mains v.

Citibank, N.A.*, 852 F.3d 669, 675 (7th Cir. 2017). Under Illinois law, the "minimum requirements"

for application of collateral estoppel are the following: (1) the issue decided in the prior

adjudication is identical with the one presented in the suit in question; (2) there was a final

judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is

asserted was a party or in privity with a party to the prior adjudication. *Gumma v. White*, 216 Ill.

2d 23, 833 N.E.2d 834, 843 (2005).

Here, on the July 18, 2022, temporary custody hearing, the state court found that there was

probable cause for the filing of the juvenile petition and that there was "an immediate and urgent

necessity to remove C.J. from his home." (Doc. 122, ¶¶ 22, 25, 29, 32; Doc. 113-4, pp. 19-20).

Whether Defendants had reasonable suspicion of a past or imminent danger of abuse or neglect on

July 14, 2022, when they decided to take protective custody of C.J.,  was an issue "controlling and

material in the temporary custody order." *Jensen v. Foley*, 295 F.3d 745, 749 (7th Cir. 2002). The

state court decided this issue against the Plaintiff, who was a party in the state court juvenile proceeding. Further, the state court's finding of probable cause in support of DCFS's juvenile petition at the temporary custody hearing on July 18, 2022, was a final judgment on the merits. *Id.* at 748-49 (holding that the state court's temporary custody hearing was a final judgment on the merits). The state court's finding of probable cause necessarily encompassed a finding of the lower threshold of reasonable suspicion. (Doc. 122, ¶ 22; Doc. 113-4, p. 19). Accordingly, collateral estoppel applies in this case as to the sufficiency of the evidence on which the state court relied to find probable cause supporting the juvenile petition. This includes Plaintiff's claims that Defendants improperly relied on Plaintiff's Bond County case to establish probable cause because that investigation found no safety threats, including no medical concerns. (Doc. 135, pp. 1-2).

On the other hand, collateral estoppel is likely inapplicable to Plaintiff's claims targeting the "integrity" of the evidence on which the state court relied for finding probable cause because there is no indication that the state court addressed that specific issue. *See Weaver,* 305 F.3d at 669–70  (noting that collateral estoppel did not bar challenges to the "integrity" of the evidence that supported the state court's finding of probable cause where there was no indication that the state court had considered that specific issue). Plaintiff argues in her Complaint and in response to the motion that Defendants did not disclose to the state court that the hotline report was made for extortion purposes. But as explained above, Plaintiff does not cite any admissible corroborative evidence. (Doc. 135, p. 3, 63-64). Likewise, Plaintiff failed to substantiate her allegations in the Complaint that Defendants falsely represented to the state court that she was no longer interested in adhering to the Safety Plan. (Doc. 14, p. 7; Doc. 135). Therefore, Defendants are entitled to summary judgment as to those claims, too.

> ii. **Continued Withholding of C.J. after Plaintiff had a Completely Negative Drug Test in October 2022**

Defendants are also entitled to summary judgment on Plaintiff's claim that her constitutional rights were violated by Defendants' continued withholding of C.J. after Plaintiff had a completely negative drug test in October 2022. Plaintiff argues that following her negative drug test in October 2022, any probable cause or reasonable suspicion of abuse had dissipated. (Doc. 14, p. 6; Doc. 135, pp. 2-3). But Plaintiff cannot show Defendants' personal involvement in the DFCS's decision to continue withholding C.J. after October 2022. Defendant Austin's last involvement with DCFS's investigation of C.J.'s abuse and neglect was on August 3, 2022. (Doc. 141-1, p. 3; Doc. 122, ¶ 26). Defendant Clayton's last involvement in this case was on August 1, 2022. (Doc. 141-1, p. 3; Doc. 122-3, pp. 109-110). Because there is no genuine dispute that Defendants were not personally responsible for C.J.'s continued withholding after October 2022, Defendants are entitled to summary judgment on that claim. *Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir. 1986) ("[an] individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation").

> d. **Plaintiff's Procedural Due Process Rights**

Defendants also argue they are entitled to summary judgment on Plaintiff's procedural due process claims. The Fourteenth Amendment protects against the deprivation of constitutionally protected interests without due process of law. *Brokaw,* 235 F.3d at 1020. The right to familial relations, as alleged by Plaintiff, is a protected liberty interest. *Id.* Both parental rights and a child's right to be nurtured by his parents cannot be denied "without an opportunity to be heard in a meaningful way." *Id.*, citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The amount of due process required varies with the situation and is a "flexible" concept, but, at minimum, due process "requires that government officials not misrepresent the facts in

order to obtain the removal of a child from his parents." *Brokaw,* 235 F.3d at 1020. Further, government officials may only remove a child from his home "without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse." *Hernandez*, 657 F.3d at 486. This requires a showing of exigent circumstances for the child's removal. *Id.* A probable cause to believe that the child was abused or neglected in the past or is in a general danger of future abuse or neglect is insufficient. *Id.*

<u>Defendants' failure to listen to Plaintiff's Admonitions and False Reporting</u>

Plaintiff alleges that her procedural due process rights were violated because during Defendants' investigation and when DCFS decided to take protective custody of C.J., Defendants repeatedly failed to listen to Plaintiff's admonitions regarding C.J., Defendant Clayton once spoke with Plaintiff and her husband but did not allow them to speak, and Defendants falsely reported that Plaintiff was no longer interested in adhering to the Safety Plan. (Doc. 14, p. 7). However, Plaintiff has not presented any admissible evidence to substantiate those allegations and create a triable issue. Defendants established that they conducted an investigation including interviews with Plaintiff, Wesley, and Wesley's father and step-mother, on July 1, 2022, that Plaintiff voluntarily agreed to the Safety Plan and to its renewal, and that on July 14, 2022, Plaintiff advised Defendant Austin that she no longer agreed to the Safety Plan, at which time Defendant Clayton decided to take protective custody of C.J. (Doc. 122, ¶¶ 9-10; 19-20).[9]

Even assuming that Plaintiff had offered such evidence, the record shows that Plaintiff's due process rights were not violated. First, DCFS took custody of C.J. on Thursday, July 14, 2022, and the state court held a post-deprivation hearing within two business days, on Monday, July 18,

---

[9] While not raised in the Complaint, in her response, Plaintiff argued that the Safety Plan was coercive because Defendant Austin made false statements and forced her to sign it. (Doc. 135, pp. 2-3; 32-34). This allegation also implicates procedural due process. However, as explained above regarding Plaintiff's substantive due process rights, Plaintiff has failed to create a triable issue on that aspect.

2022. The record shows that Plaintiff attended that hearing, and Plaintiff has not alleged otherwise. (Doc. 113-4, p. 19). There, the state court found there was "immediate and urgent necessity to remove C.J. from his home and that leaving C.J. in the home environment would be contrary to his health, safety and welfare." (Doc. 122, ¶ 22; Doc. 135, pp. 18-21). The state court granted temporary custody of C.J. to DCFS with the right to place C.J. (*Id.*). Because the state court found in the post-deprivation hearing, in Plaintiff's presence, that there were exigent circumstances for C.J.'s removal, Defendant Clayton's decision that DCFS take protective custody of C.J. did not violate Plaintiff's due process rights.

Ex parte temporary custody hearing on July 28, 2022

Plaintiff also claims that her due process rights were violated because Defendants proceeded with the July 28, 2022, temporary custody hearing despite Plaintiff being absent due to her being in custody. (Doc. 135, pp. 2-3). Defendants do not dispute that the state court held a renewed temporary custody hearing on July 28, 2022, to which Plaintiff did not appear because she was in custody. (Doc. 122, ¶ 25). That renewed temporary custody hearing was held after the state court had already found on July 18, 2022, in Plaintiff's presence, that there was an "immediate and urgent necessity to remove C.J. from his home and that leaving C.J. in the home environment would be contrary to his health, safety and welfare." (Doc. 122, ¶ 22).

To the extent Defendants were personally responsible for the state court's decision to proceed with an ex parte renewed temporary custody hearing on July 28, 2022, this would qualify as akin to prosecutorial "in-court conduct" that is protected under absolute immunity. In *Millspaugh v. County Department of Public Welfare*, two mothers alleged that a social worker violated their due process rights when they failed to notify the mothers of subsequent custody hearings, proceeded on those hearings ex parte, failed to furnish the court with evidence favorable

Page **21** of **22**

to the mothers' case, and continued to pursue the litigation even after it was clear that the mothers were entitled to custody. 937 F.2d 1172-75 (7th Cir. 1991). The social worker had taken custody of the children after applying for and obtaining a court order to do so. *Id.* at 1173–74. The Seventh Circuit explained that social workers pursuing a child-custody case act like prosecutors and witnesses and are thus protected by absolute immunity for their in-court conduct, including in ex parte proceedings. *Id.* at 1175–76. Because *Millspaugh* is controlling and directly on point, the Court finds that Defendants are absolutely immune from liability for any conduct they engaged in during the renewed temporary custody hearing on July 28, 2022, which caused the state court to proceed ex parte.

Accordingly, there is no genuine dispute of any material facts, and Defendants are entitled to summary judgment as to Plaintiff's procedural due process claims.

### Conclusion

For these reasons, Plaintiff's Emergency Motion to Stay Adoption Proceedings (Doc. 96) is **DENIED,** and Defendants' Motion for Summary Judgment (Doc. 121) is **GRANTED**. This case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

**DATED: March 9, 2026**

*s/ Reona J. Daly*
**Reona J. Daly**
**United States Magistrate Judge**